85 P.2d 749

**BURGUETE v. G. W. BOND & BRO.
MERCANTILE CO. (two cases).**

**HOWELL v. SAME.**

No. 4408.

Supreme Court of New Mexico.

Dec. 20, 1938.

Reed Holloman, of Santa Fe, for appellants.

Marron & Wood, of Albuquerque, for appellee.

BRICE, Justice.

The first question is whether the defendant's general manager had authority to make for it the contracts sued on in the consolidated cases; and, if not, second, whether the defendant ratified them. The parties will be designated plaintiffs and defendant, as in the district court.

The following facts are not contested:

The defendant is a corporation which has for many years been engaged in the mercantile and ranching businesses. The plaintiffs are in the ranching business.

The duties of the president of the defendant corporation were: "To preside, when present, at all meetings of the board of directors, and to sign all instruments in writing made and entered into by the company, and to sign all certificates of stock, and perform such other duties as usually pertain to such office, or as may be required of him by the board of directors." Frank Bond was the president of the defendant corporation at all times material.

The by laws of the defendant corporation provided that a general manager should be elected by the board of directors, who should "perform such duties as the board

should direct." The board at no time prescribed the duties of its general manager.

R. C. Dillon was manager of the defendant corporation from 1908 to 1918; and its vice-president and general manager from 1918 until January 1, 1927; at which time he became governor of the state of New Mexico. After his term of office as governor had expired, and on October 5, 1931, he again became general manager and vice-president of the defendant corporation, and continued as such until November 1936.

Each of the plaintiffs was indebted to the defendant, and to secure the respective debts each had conveyed by deed to the defendant certain real estate described in the complaints. Each of the plaintiffs had "partido" contracts with the defendant, under which they were running defendant's sheep for a percent of the profits and increase.

In the month of December, 1932, the general manager of the defendant corporation sought a loan of $90,000 for the corporation from the Regional Agricultural Credit Corporation. As one of the conditions upon which such loan would be granted, the Credit Corporation required that it be given assignments of the mortgages (deeds) on the lands of the plaintiff Burguete and the plaintiff Howell, and in order to assure adequate pasture for livestock to be mortgaged by the defendant to it to secure such loan, that the defendant procure assignments of such leases as plaintiffs might hold.

That in order to comply with such requirements, Dillon (the general manager) approached the plaintiffs with a view to obtain the necessary assignments, and they did assign all the state leases held by them, and Burguete deeded two quarter sections of patented land; and in addition thereto they signed subrogation contracts as to their rights in the partido sheep leased by the defendant corporation to them, and agreed that all their business would be handled through the defendant and with its approval until the loan to the Regional Agricultural Credit Corporation should be paid off.

That in return for such acts and agreements on the part of the plaintiffs, R. C. Dillon, on behalf of the defendant corporation, agreed with each of the said plaintiffs that if and when the loan of the Regional Agricultural Credit Corporation should be paid off, thereupon any indebtedness remaining due from the said plaintiffs to the defendant corporation would be cancelled and forgotten, and that all the security given by the plaintiffs to the defendant corporation, being the deeds and assignments of state leases, would be reconveyed to the plaintiffs, free and clear of all claims of the defendant corporation.

After the general manager of the corporation had secured the transfers mentioned, and had completed arrangements for borrowing the $90,000, the board of directors of the defendant, by resolution, authorized its president to execute notes for said loan and to secure their payment by a pledge of

the corporation's property. The general manager did not notify any director or officer of the corporation of the consideration for which the plaintiffs had conveyed and assigned their property to the defendant; and apparently the first knowledge thereof was obtained from the plaintiffs' attorneys. The resolution of the board of directors just mentioned was required by the Regional Agricultural Credit Corporation.

There is no evidence in the case from which it could be inferred that from the time the defendant ascertained that its general manager had entered into the contract sued on that it has taken any steps to return to plaintiffs any of the leases assigned to the corporation or the property deeded to it by plaintiff Burguete in consummating the contract; or showing any steps toward compensating plaintiffs for their property.

At the time judgment was entered in this case defendant's debt to the credit corporation had not all been paid.

The court's finding of fact No. 10 is: "That R. C. Dillon, during the time that he served in the capacity of general manager of the defendant corporation, did all things ordinarily and usually necessary to be done in connection with the operation of the business of the defendant corporation, which said business consisted of the running of large numbers of sheep, leasing of sheep on partido contract, the operation of a general mercantile store establishment, and all things ordinarily and usually necessarily incident to such type of business;

and that the said R. C. Dillon, as such general manager, during said years, was relied upon by Frank Bond, president of the company, and it does not appear that any director, except Frank Bond, either individually or as a member of the board of directors of said corporation, ever gave or caused to be given to the said R. C. Dillon any directions or suggestions, either generally or concerning any specific action taken in connection with said company's business. In the usual and ordinary circumstance, the board of directors met only once a year, at which time the principal subjects discussed were the election of officers and general conditions. However, special meetings of the board of directors were held, but not often, there being no evidence as to their number, or the subjects discussed."

The trial court made additional findings of fact in the body of the judgment, the parts of which, material to a decision, are as follows: "At the time of the conveyance by the plaintiff pursuant to such purported agreement, and at the time the defendant accepted such conveyances and pledged them to the R. A. C. C. it and its officers and agents were not advised and had no knowledge or notice of the aforesaid oral agreement made by the General Manager; and the defendant accepted such conveyances, and in turn mortgaged and pledged them to the R. A. C. C. in good faith and in ignorance of such condition as to release to which the General Manager had agreed, and the plaintiff's said property now still stands mortgaged and pledged to

secure such loan from the R. A. C. C. to the defendant, which is unpaid in part."

As the plaintiffs made no objections in the district court to the findings of the court, which included the foregoing facts, they are the facts upon which the case must be decided by this court. In re White's Estate, 41 N.M. 631, 73 P.2d 316.

The trial court concluded that the authority of Governor Dillon was limited to such acts as pertained to the ordinary and usual scope and conduct of defendant's business; that the agreements with the plaintiffs, which are the subject of this suit, were extraordinary and unusual contracts, and beyond the power of the general manager to bind the company, and therefore were void. That the defendant had a lien on all the property of the plaintiffs which had been conveyed to it prior to the making of the contracts in question, to secure the sums plaintiffs owed defendant.

In the body of the judgment the court concluded: "That the act of the General Manager in making such agreement to' release the plaintiffs' security and the discharge of its debts when the R. A. C. C. loan should have been paid was neither authorized nor ratified by the defendant and was unknown and undisclosed to the defendant or its officers or directors and the same is void as to the defendant who was not bound or obligated by the acts of the General Manager in making such an agreement."

It is contended that the court erred in including in finding number 10 (heretofore quoted in full) the following: "It does not ·appear that any director *except Frank Bond,* either individually or as a member of the board of directors of said corporation, ever gave or caused to be given to the said R. C. Dillon any directions or suggestions, either generally or concerning any specific action taken in connection with said company's business." The contention being that the president, Frank Bond, did not give any instructions or suggestions, etc., to defendant's general manager.

There is evidence supporting the finding.

Plaintiffs contend that the court erred in refusing to find at their request "That there is no evidence showing what, if any, directions Frank Bond ever gave to R. C. Dillon as general manager of the defendant corporation, except that contained in a certain letter introduced in evidence." . This is a request for the finding of evidentiary facts, not necessary to a decision, and was properly refused.

Plaintiffs' point two is: "R. C. Dillon, as general manager of the defendant corporation had the authority to enter into the disputed contracts with the plaintiffs and such contracts are binding on the defendant."

The plaintiffs go very fully into the testimony to show that the authority of Governor Dillon was practically unlimited, and present their contention with much force and reason; but the argument is based upon the testimony in the case, and not on the findings of the court.

We have stated that this court is limited to finding of fact number 10 for the author-

ity of the general manager, from which it appears that he was "authorized to do all things *ordinarily and usually necessary* to be done in connection with the operation of the business of the defendant corporation, which said business consisted of *running of large numbers of sheep, leasing of sheep on partido contracts, the operation of a general mercantile store establishment and all things ordinarily and usually necessarily incident to such type of business."* (Italics ours).

■ We are not permitted to review the testimony to determine the actual or apparent authority of Governor Dillon as general manager of the business of the defendant corporation. The finding of the district court in this regard was accepted by plaintiffs (with the minor objection ruled on) and of course is binding here. If it had been desired to raise the question whether Gov. Dillon's authority over the business of the corporation was unlimited, as plaintiffs contend, then findings of ultimate facts should have been requested and a ruling thereon obtained from the trial court, so that the question could have been reviewed here.

■ Assuming that finding of fact number 10 is supported by the evidence (which we must), then we agree with the trial court, that the authority to run and lease sheep on partido contracts, and operate a mercantile business, and to do *"all things ordinarily and usually necessarily incident to such type of business,"* does not include the right to make contracts that would cancel out debts aggregating $50,000 due the defendant, or even refinance its general obligations. Such authority is not *ordinarily and usually necessary* to the running and leasing of sheep, or to the buying and selling of merchandise. It is ordinarily the function of a board of directors. The fact that the board of directors "in the *usual and ordinary circumstances,* met only once a year, at which time the principal subjects discussed were the election of officers and general conditions," added nothing to the authority of Governor Dillon, which was specific and limited according to the trial court's finding.

In Bank of Commerce v. Baird Mining Co., 13 N.M. 424, 85 P. 970, the Territorial Supreme Court, in holding that the managing agent of a mining company had no general powers to make drafts on the company's account, stated [page 971]:

"There can be no doubt that the Baird Mining Company had held Rishworth out as its managing agent in New Mexico, and that it is bound by such acts as came in the direct scope of his authority as manager of the company; but a managing agent of a corporation, other than a cashier of a bank, has no implied power to bind the corporation by making, accepting, or indorsing negotiable paper, and when such a power in him is claimed it must be sought for in some special authorization, or in such a continued exercise of it as amounts to a holding out of him by the corporation as possessing it, raising the implication of it as a previous authorization or a subsequent ratification. * * *

"It is a well-settled rule of law that those dealing with a known agent of a corporation or of an individual, do so at their peril, as to his authority, where the act is not within the regular scope of the ordinary power of an agent."

The authority of a general agent is stated in Restatement of the Law of Agency as follows:

"Unless otherwise agreed, authority to manage a business includes authority:

"(a) to make contracts which are incidental to such business, are usually made in it, or are reasonably necessary in conducting it;

"(b) to procure equipment and supplies and to make repairs reasonably necessary for the proper conduct of the business;

"(c) to employ, supervise, or discharge employees as the course of business may reasonably require;

"(d) to sell or otherwise dispose of goods or other things in accordance with the purposes for which the business is operated;

"(e) to receive payment of sums due the principal and to pay debts due from the principal arising out of the business enterprise; and

"(f) to direct the ordinary operations of the business. * * *

"Comment:

"Prima facie, authority to manage a business does not include authority to make unusual or extraordinary contracts; to discontinue the business or any department thereof; to sell, pledge, or otherwise dispose of the business or any branch thereof, or the premises upon which it is conducted; or radically to change the nature of the business or to engage in a new business.

"Prima facie, a manager has no power to borrow money in connection with the operation of the business or to issue negotiable instruments in the name of the principal, except where the business conducted is one involving the borrowing of money or the issuing of negotiable instruments, such as banking and other financial businesses.

"In all the above cases, however, authority to act may be inferred from the circumstances of the authorization or from subsequent events, as where, in the absence of the principal, an emergency arises which can be met only by exceeding what is ordinarily the manager's authority. * * *

"P appoints A as the general manager of a copper mine in State X owned and conducted by P, a corporation whose home office is in State Y. Finding that he has not sufficient funds on hand for the present operation of the mine and without consultation with the officers of the corporation, A borrows money from a local bank for use in the business and gives to the bank negotiable promissory notes in the name of the principal for the money so borrowed. Nothing else appearing, A is not authorized to do this." Restatement of the Law of Agency, Sec. 73 and comment "b" with illustration 9 thereunder. Also see Neuhart v. George K. Porter Co., 23 Cal.

App. 526, 138 P. 951; Horowitz v. S. Slater & Sons, 265 Mass. 143, 164 N.E. 72; Salt Lake Valley Loan & Trust Co. v. St. Joseph Land Co., 73 Utah 256, 273 P. 507; Hall v. Passaic Water Co., 83 N.J.L. 771, 85 A. 349, 43 L.R.A.,N.S., 750; Carroll-Cross Coal Co. v. Abrams Creek Coal & Coke Co., 83 W.Va. 205, 98 S.E. 148.

■ It having been determined that defendant's general manager was not authorized to make in its behalf the contracts in question, unless defendant ratified the unauthorized act of its agent, the court's decree was correct. The burden was upon the plaintiffs to prove such ratification, Williams v. Bolling, 138 Va. 244, 121 S.E. 270; Hopkins v. Clark, 7 App.Div. 207, 40 N.Y. S. 130.

The court found as facts: "That the auditor of the defendant corporation, in his annual audit of the accounts of the plaintiffs, continued to carry them (plaintiffs' accounts) as regular accounts, and R. C. Dillon never advised the auditor or the other directors of the corporation, or anyone, of the agreements made by him with the plaintiffs, or of any conditions attached to such accounts, although annually the auditor went over all the accounts individually with the said R. C. Dillon, and specifically discussed the accounts in question; * * *"

That there is no evidence from which it could be inferred:

"That from the time the defendant corporation ascertained that R. C. Dillon had entered into the contract with plaintiffs, as alleged in this action, the defendant has taken no steps to return to plaintiffs any of the leases assigned to the defendant under that contract, or the property deeded by the plaintiff Burguete to the corporation after the contract was made, or have taken no steps, in any way to compensate them for such action.

"Which requested finding the Court makes and adopts with the change that there is no evidence of the facts set forth in such requested finding."

The trial court found that the disposition made of plaintiffs' property, in arranging for it to be used as security for the loan from the credit corporation, was dictated by that corporation; that the loan is unpaid in part and that the title to plaintiffs' property is still held in the manner required by that corporation for its security, which included not only the real estate in question, but the livestock (including all sheep run by plaintiffs under partido contracts) that belonged to the defendant.

Plaintiffs contend that as the defendant, with knowledge of plaintiffs' claims, kept the fruits of the contracts, it ratified the unauthorized acts of its agent.

■ Unless the defendant retained plaintiffs' property, after having knowledge of *all the material facts* regarding the contracts sued on (Walls v. Erupcion Min. Co., 36 N.M. 15, 6 P.2d 1021) and before it had changed its position so that it could not make restitution, the failure to do so is not an affirmance of the contract.

"The retention by a purported principal, with knowledge of the facts and before he has changed his position, of something which he is not entitled to retain unless an act purported to be done on his account is affirmed, and to which he makes no claim except through such act, constituted an affirmance unless at the time of such retention he repudiates the act. Even if he repudiates the act, his retention constitutes an affirmance at the election of the other party to the transaction. * * *

"The principal is under no duty to return things received as the result of an unauthorized act if, before becoming aware of the facts, he receives title thereto as a bona fide purchaser, or he incorporates them in something from which they cannot be separated, or if they have become so mixed with his things that they are indistinguishable. Likewise, if the situation of the principal has so changed that it is inequitable to require their return under the changed conditions, their retention does not constitute an affirmance. * * *" Restatement of Law of Agency, Sec. 99 and Comment c.

The trial court did not include in its findings the date defendant learned of the plaintiffs' claims, but it is stated in defendant's brief that it was in December, 1936, just prior to the filing of these suits. The defendant, in its answer, denied that such contracts had been made, and we are satisfied that it did not believe they had been made. The purpose of this suit was to determine that very question, among others.

It was stated by the Tenth United States Circuit Court of Appeals, in General Paint Corp. v. Kramer, 57 F.2d 698, 703, regarding a similar question:

"This court has had occasion to state and affirm the wholesome doctrine that, where one has knowledge that another has purported to act for him without authority, he cannot retain the benefits of the act and escape the burdens. * * *

"Furthermore, the cornerstone of ratification is knowledge of all material facts. * * *

"The first knowledge or notice which defendants had of this oral contract was when the petition was filed, or a few days before. It is a very serious question whether notice of plaintiff's *claim* that an oral contract was made, which Boylan denied, satisfies the requirement of *knowledge* of the contract; defendants did not *know* an oral agreement was made; what they knew was that plaintiff so claimed."

We have the same question here. The defendant *knew* of the plaintiffs' *claims* from the allegations in their complaints, but could it be said that it *knew* such an oral agreement had been made merely because it was so claimed by plaintiffs? To so hold would force the defendant to give up the fruits of the contract *before* it had been determined by the court that it was required to do so; though it only had plaintiffs' word that they had parted with their property upon the conditions claimed, which it did not know to be a fact, and whether a fact or not, was one of the principal questions for the court to decide.

■ There is no finding that defendant has not returned plaintiffs' property but only *that there is no evidence of such fact.* The burden was on plaintiffs to prove affirmatively that restitution had *not* been made, and they failed to do so.

■ But we need not rest our decision on this technical ground, or upon the ground that knowledge of plaintiffs' claims before the decree was entered was not proof of knowledge of the facts regarding the contracts. It affirmatively appears from the findings that the debt of the credit corporation has not been fully paid and that plaintiffs' property is still held as security therefor. The defendant so changed its position before it had knowledge of plaintiffs' claims that it cannot make restitution until the debt to the credit corporation is paid, and cannot under such circumstances be held to have ratified the contracts its agent made, upon the ground that it has not made restitution.

The partido contracts were "subrogated to the credit corporation's debt," and the sheep, as well as the land and leases, were turned over to defendant to be used as security for that debt. It is apparent from the findings that it was required by the credit corporation that the defendant should hold title and possession of all plaintiffs' property until its debt was paid. The contracts in suit were not ratified by defendant.

This action was brought under authority of Chapter 143 of N. M. Laws of 1935 to have the rights of the parties declared, regarding the controversy stated in the pleadings, sections 1 and 2 of which are as follows:

"Section 1. In cases of actual controversy, the courts of record of the State of New Mexico shall have power, upon petition, declaration, complaint, or other appropriate pleadings, to declare rights and other legal relations of any interested party petitioning for such declaration, whether or not further relief is or could be prayed, and such declaration shall have the force and effect of the final judgment or decree and be reviewable as such.

"Section 2. Further relief, based on declaratory judgment or decree, may be granted whenever necessary or proper. The application shall be by petition to the court having jurisdiction to grant relief. If the application be deemed sufficient, the court shall, on reasonable notice, require any adverse party, whose rights have been adjudicated by the declaration, to show cause why further relief should not be granted forthwith."

The trial court concluded that the debt due by plaintiffs to defendant had not been cancelled; found the amounts thereof and the nature of the security. Provision was made for future proceedings to enforce defendants' rights as declared, by appropriate remedy.

The judgment of the district court is affirmed. It is so ordered.

HUDSPETH, C. J., and SADLER, BICKLEY, and ZINN, JJ., concur.